**SPIDEL, et, Plaintiffs-Appellees, v. WARRICK, et, Defendants-Appellants.**

Ohio Appeals, Second District, Darke County.

No. 653. Decided January 31, 1948.

414

Wilbur D. Spidel, Richard E. Hole, Greenville, and Webb R. Clark, Dayton, for plaintiffs-appellees.

T. A. Billingsley, Greenville, O. J. Myers, Dayton, and Jesse K. Brumbaugh, Greenville, for defendants-appellants.

## OPINION

By MILLER, J.:

This is a law appeal from a judgment setting aside the purported will of John W. Spidel upon the ground of mental incapacity and undue influence. The jury returned a general verdict in favor of the plaintiffs which must be taken as a finding in favor of the plaintiffs on both issues, no special interrogatories having been submitted to the jury. **Sites v Haverstick, 23 Oh St 626.**

The record discloses that John W. Spidel was born in 1865; that his education was very limited, not being able to either read or write, except to sign his own name, although one of the witnesses testified that he attended the public schools with him, that he went as far as the fifth grade and that he heard him read numerous times in school. He resided in the family homestead as long as his parents lived, and after their death he and his sister Sarah resided there until her marriage to Dale R. Warrick in 1921. This marriage did not meet with his approval at first, so John moved out of the family home when the husband came in. Some of the witnesses testified that John became very angry over this marriage, as he thought that Dale Warrick was marrying his sister for her money and he stated on several occasions that Dale Warrick would never get any of his money. However, after the lapse of approximately six months he became reconciled and moved back into the home of his sister Sarah and her husband and lived with them up to the time of his death, he having been a bachelor all his life. Upon the death of his mother who survived his father by some twenty years, the estate was divided among the five children, John and his brother Dan acquiring several farms which they held jointly and operated until Dan's death, after which Dan's widow, Margaret Jennie Spidel, who will hereafter be referred to as Jennie, continued to operate the farm on a partnership basis and acquired more land.

The record discloses also that Dan operated a livery stable in Greenville and that John worked there, sleeping in the office at the stable at night, on blankets, for a period of time, the length varying from six months to several years. The nature of the business was such that an attendant was required to be on the job at all hours. Some of the testimony shows that Dan was the boss and that John always took orders

from Dan. Oftentime when John would be engaged in conversation with other loafers around the barn Dan would tell John to "shut up" or that he was "crazy." Likewise in the operation of the farms the' testimony shows that Dan, who was better educated having been a country school teacher, looked after the business and after his death his widow, Jennie assumed this responsibilitly. After her death his sister Sarah and her husband assisted him, keeping his records and helping in the management of the properties. The record is undisputed that he attended practically all of the public auction sales conducted on farms in the community; that he purchased livestock, farm machinery, tools and equipment, being especially interested in job lots of small trinkets which were mostly junk and which he purchased for practically nothing. In these dealings he always had a partner that assisted him, although he did most of the bidding himself. The property thus acquired was resold or traded for other things of value. Several witnesses testified that he always carried cheap pocket knives, jewelry and small trinkets which he enjoyed trading in.

In September, 1931, Jennie Spidel died leaving a will in which she bequeathed some of her property to the Missionary Society of the Presybterian Church and the balance of the estate was to be divided into four parts, one-fourth going to each of Dan's four brothers and sisters if living or their children, if deceased. On January 9, 1932 Francis Grise and Forrest Grise, who were beneficiaries under Jennie's will, filed a partition suit asking for a partition of the ancestral real estate, formerly in the name of Dan Spidel. In one of these farms John had a one-half interest and by inheritance had acquired a one-fourth interest in the share of Dan Spidel.

The record shows that John attempted, without success to persuade the plaintiffs who were his nephews, to refrain from partition and from forcing the land to sale at a time when the country was experiencing a most severe economic depression. The record discloses further that on March 5, 1932, John filed a suit for several thousand dollars against his brother Jacob on several alleged lost notes and that in this litigation Jacob was represented by his son Wilbur Spidel who was a practicing lawyer. This suit was pending, with the defendant's denial of the execution of the notes at the time that John executed his will.

The record further shows that on April 8, 1932, Jacob C. Spidel, through his son Wilbur, and without consulting or advising John, filed a partition suit to partition all the land

devised under the will of Jennie Spidel. A similar suit was filed on the same day by the Stoltz heirs. This suit involved approximately 1000 acres of land and several town properties in which John was the owner of a one-half interest. John bitterly resented the filing of this suit which would force the larger part of his real estate holdings on the market under the then existing depression.

The record discloses further that on May 20, 1932, a suit was filed by the executor to construe certain provisions of Jennie Spidel's will, and on June 17, 1932, the Grise members of the family instituted an action to contest some of the provisions of the will. This was resented by John as it was his desire that the terms of the will be carried out according to her wishes. All of these aforementioned suits were pending on July 6, 1932, when John Spidel made his will. All of his interests in approximately 1000 acres of land and several town properties were the subject of these various suits. The country was in the midst of a great depression and all of his relatives, except his sister Sarah and her husband, were attempting to force a sale of this real estate. Also prior to the making of the will John had endeavored to effect a settlement with his brother Jacob and the Stoltz heirs but his efforts failed. It was under these conditions that on July 6, 1932, John W. Spidel executed his will, giving to Sarah and her husband, Dale Warrick, a life estate in all his property and after the death of the life tenants, all of the property should be reduced to money and the proceeds divided equally between the Church of the Brethren and the Presbyterian Church, both of Greenville, Ohio. His mother had been a member of the Brethren Church, to which Sarah and Dale belonged.

The evidence shows that John anticipated that his will would be contested, so he had prepared the following instrument which he circulated and had signed by 34 acquaintances and friends, consisting of bankers, business men, and farmers:

"Greenville, Ohio, July 2, 1932
"To Whom Concerned:—

This is to certify that we, the undersigned, are well acquainted with J. W. Spidel and have talked to him and associated with him for a number of years and that we are absolutely certain that said J. W. Spidel is now and always has been fully capable, in every way, to make a will and to transact any kind of ordinary business. We also, certify that we consider him in every way able to properly transact business

and we would be willing to enter into any kind of a transaction with him knowing him to be absolutely capable of understanding the minutest details of such transaction. That he is capable of making a will and is of sound mind and knows his relatives and his obligations to them and their obligations to him and knows the nature and extent of his property is a fact beyond dispute in our opinion

J. J. Roth

H. M. Albright

G. G. Hildebrand

E. G. Reigle

W. F. Norris

Pierre V. Coppess

W. H. Brokaw

J. E. Boyer

Dan H. Brown

E. G. Husted

Chas. Nischwitz

J. W. Mendenhall

S. R. Hiatt

Jos. Menke

D. H. Wheeler

J. E. Kline

W. F. Straker

Chas. Deubner

C. O. Westfall

E. E. Kester

Paul C. Brown

Ora Wyan

F. H. Clark

L. E. Peirson

G. H. Rehmert

Wm. H. Grewe

Dr. W. E. Guntrum

B. F. Metcalfe

C. Foureman

J. Ed. Williams

Geo. S. Werner

H. D. Stephens

W. H. Tillman

E. A. Goubeaux."

This instrument was found with the will, but was not admitted to probate with it. It was offered in evidence as "Defendants' Exhibit No. 34", but was rejected although it was read to the jury in full. The will was prepared by Thomas J. Hughes, a lawyer, who died many years before John and who on one occasion performed legal services for Dale Warrick.

The record shows that at the time of the execution of the will no one was present except the lawyer and two attesting witnesses. The will was left at the lawyer's office until his death, after which John secured it and deposited it with the Probate Court. On December 3, 1942, he removed it from the Probate Court and deposited it in a lock box in The Citizens State Bank where it remained until his death. He was accompanied by Dale Warrick when he removed the will from the Probate Court to the lock box. His physical condition appears to have been good up until the time of the execution of the will, with the exception that in July, 1933, he had a kidney removed which had been bothering him somewhat for several years prior thereto. One witness testified it had caused him to have occasional faintings spells.

As a result of the partition suit the sale of the land was held on September 23, 1933, John having bid some of it in at the sale price of $42,850.00. The sale was confirmed on September 29, 1933. John had difficulty in raising the immediate cash, and on October 5, 1933, Wilbur D. Spidel, acting on behalf of his father Jacob, filed a motion for an order requiring all purchasers to comply or show cause why they had not complied with the terms of the sale. Upon hearing being had the Court fixed the date for compliance as October 16, 1933. Upon noncompliance with this order a citation for contempt was filed by Charles A. Stoltz. A loan was finally secured through the Federal Land Bank by means of which he was enabled to pay off several short term loans which enabled him to complete the purchase. It seems that the plaintiff is contending that Sarah misrepresented to John that Jacob was going to have him put in jail because of the motion he filed on October 5, 1933. This, if true, could have had no effect in influencing John as to the terms of a will which had been made over a year previous. As it later turned out, the filing of the partition suit was not harmful to John, but as a matter of fact it was beneficial as he secured the land at depreciation prices and it had practically doubled in value at the time of his death.

The record shows also that John's relationship with all of the members of the family had been friendly up until the time of Jennie's death and the filing of the various lawsuits.

It is useless to recite the chaotic conditions existing in this country at the time these suits were filed, and any normal person could readily understand why John did not want his farms sold at forced sale under such conditions. Our state Legislature took cognizance of this fact by enacting laws restricting foreclosures on real estate.

The first assignment of error relates to error in the admission of evidence offered by the plaintiff. These objections were to certain hypothetical questions propounded to the medical experts as not being based upon facts contained in the record. We find this objection well taken in the following instances:

On page 1032 of the record is the following language contained in a hypothetical question:

"Now doctor the testimony has been that John was suspicious of his relatives - of various of his relatives - made so by what his sister told him."

We find no evidence in this record of any suspicious con-duct on the part of John Spidel nor is there any evidence that his sister Sarah told him any untruths which resulted in his treating them with suspicion.

On page 1070 the language of the hypothetical question objected to is improper for the same reason.

On page 1072 the following was objected to:

"And that Jacob Spidel and the other members of the family, and the heirs were willing at all times to cooperate with John Spidel."

This question is not based upon the evidence for we find no evidence in the record that the heirs were at all times willing to cooperate.

On page 1074 the objection to the question is well founded for the reason that the partition suit is referred to as a friend-ly procedure and the record discloses that it was not a friendly procedure. Jacob Spidel testified that he did not discuss this suit with John before the same was filed, and when he did tell John about it and tried to explain it, he said, "Oh, John just raired and got mad and was going to whip me."

On page 1071 objection was made to the hypothetical question which requested the witness to consider "all the facts you have heard here today". This question was too broad as it did not limit the witness to expressing himself upon the facts that were propounded to him by counsel. The witness could have answered the question based upon any informa-tion he may have received in the office of counsel for the plaintiffs or around the corridors prior to his testifying. In **Manley v Colvin, 19 Oh Ap 285,** syllabus 5, it is said:

"The hypothetical question must fully and fairly reflect the facts and the omission of facts which are in evidence renders such a question improper, where what is included manifestly fails to present the facts in their true relation."

See also **Cincinnati Mutual Inc. Co v James May, 20 Ohio Reports, 212.**

We find the errors heretofore referred to were prejudicial to the rights of the defendants as improper evidence was per-mitted to go to the jury.

The next assignment of error is that the Court erred in rejecting evidence offered by the defendants. This assign-ment relates to the refusal of the Court to admit Defendants'

Exhibit No. 34 which was the petition circulated by John and signed by thirty-four of his acquaintances as to his mental condition. We think this evidence was improperly rejected, and should have been admitted under proper instructions to the jury, not as substantive proof of the facts therein contained, but as possibly throwing some light upon his state of mind at that time. If the evidence was competent for any purpose it was admissible. **Adams, Exr. et al. v Foley, et al., 36 Oh Ap 295.** Issues relating to undue influence are generally determined upon circumstantial evidence and influence drawn from a full presentation of facts which may be inconclusive when taken separately. A wide range of inquiry is therefore permitted to bring before the jury facts and influences bearing upon the preparation of a will. **Board of Education v Phillips, 103 Oh St 622; Koch v Meyers, 7 Oh Ap, 306; Fox v Lynch, 43 Oh Ap 305; 41 O. Jur. Sec. 346, p. 488.**

We recognize the fact that this instrument was read to the jury but we do not believe that this is determinative of the question, as the jury was entitled to its inspection and by its rejection may not have given to it the weight to which it was entitled. The rejection of Defendants' Exhibit No. 34 was prejudicial error.

An objection is made also to special charge No. 2 submitted by the plaintiffs and given by the Court to the jury. The objection is made that this charge refers only to "delusions" and that it should have been "insane delusions". It should be noted, however, that the charge referred to defined the word "delusions'" as follows:

"* * * that is false beliefs not founded upon fact or reason and which beliefs could not be removed by argument or persuasion."

This is a correct definition for an insane delusion. See **41 O. Jur. Sec. 86 p. 318.** We find no error in this charge as given.

The next assignment of error relates to the alleged misconduct of a juror. This was submitted to the Court by affidavits and counter-affidavits relating to the conduct of one of the jurors during the course of the trial. The sufficiency of these charges was a matter resting within the sound discretion of the Court and unless there is an abuse of discretion the same will not be disturbed. **Phillips, et al. v Board of Education, 21 Oh Ap 194.** We find no abuse of discretion in the Court's ruling.

The last assignment of error relates to the sufficiency of the evidence and to the failure of the Court to direct a verdict for the defendants throughout the various stages of the trial. To review the testimony of the various witnesses would not be practicable, as the bill of exceptions contains over 2000 pages, the trial having lasted approximately four weeks. The issues in this case must be directed to the date of the execution of the will in question, to wit, July 6, 1932. In order to justify the setting aside of a will on the grounds of undue influence or testamentary incapacity, the burden of proof is upon the contestants of the will and before the jury would be justified in setting aside the will the evidence adduced against it must outweigh both the evidence adduced in favor of the will and the presumption arising from the order of the Probate Court admitting the will to probate as the valid last will and testament of the testator. Now did the evidence offered by the contestants meet these requirements? We do not think it did. The evidence taken in its most favorable light towards the plaintiffs shows that John Spidel was uneducated, had the mind of a ten or twelve year old child, enjoyed trading in live stock, farm equipment and similar items, that he invested all of his income in farm lands which he was able to successfully manage with the assistance of others. He was on friendly terms with all of his relatives until the various suits were filed against him and those attacking the will of Jennie Spidel. He then became mad at all of his relatives who were active participants in these suits, with the exception of his sister Sarah who did not participate. Many of the hypothetical questions propounded to the medical experts were based upon the fact that he was suspicious of his relatives and that the partition suits were friendly proceedings, which is not supported by the record. He became angered at them because of these suits. Jacob testified that after the litigation he and John never spoke when they met on the street. John's anger was based upon a reason and therefore it could not be the basis of an "insane delusion" as was testified by several medical experts. Their testimony was based upon the wrong premise. Practically all of the witnesses, with only a few exceptions, testified that his mental condition was such as to satisfactorily meet the requirements laid down in **Niemes v Niemes, 97 Oh St 145.** Relative to undue influence this evidence showed that John enjoyed confidential relationships with his sister Sarah and her husband, two of the beneficiaries of the will, from which the suspicion of influence might arise, but there is nowhere in the record any direct evidence of influence by either

of these parties. One witness testified that Sarah said in John's presence that "we fixed it so they won't get any of our money, didn't we, John?" This is no direct evidence of influence but an inference might be derived from it but certainly of very little weight. Also, on several occasions Sarah said John was leaving all of his money to them and then to the Church. This would indicate that Sarah was cognizant of the contents of the will, but certainly throws no light upon the question of undue influence. The record shows that Sarah hated her relatives as much as John did, and that she took no active part in the partition suits. It also appears that she became angered at the other members of the family for their attitude toward John. It is contended that she made false statements to John about his relatives for the purpose of influencing him, but we find no evidence in the record to support these charges.

After viewing all this testimony in the light most favorable to the plaintiffs we are clearly of the opinion that the jury was not warranted in finding for the plaintiffs on either one of the two issues raised by the pleadings. The will of a person found to be possessed of a sound mind and memory and acting without restraint should not be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason therefor.

The judgment is therefore reversed for prejudicial error in the record and also as being against the manifest weight of the evidence. The cause is ordered remanded for a new trial.

WISEMAN, PJ, and HORNBECK, J, concur.